IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| BOBBY A. JOHNSON, | ) | CASE NO. 1:03 CV 1613 |
| | ) | |
| Petitioner, | ) | JUDGE PATRICIA A. GAUGHAN |
| | ) | |
| v. | ) | MAGISTRATE JUDGE |
| | ) | WILLIAM H. BAUGHMAN, JR. |
| RICHARD HALL, Warden, | ) | |
| | ) | **REPORT & RECOMMENDATION** |
| Respondent. | ) | |

## I. Introduction

Petitioner Bobby A. Johnson filed a petition for writ of habeas corpus with four grounds for relief.[1]  Jurisdiction will lie if the petitioner remains in custody pursuant to a judgment of the state court and claims that such custody violates the Constitution, laws, or treaties of the United States.[2]  Here the State of Ohio retains custody of Johnson at the Richland Correctional Institution in Mansfield, Ohio.  This Court, therefore, has jurisdiction over Johnson's claims.

Johnson argues in ground one of his petition that there was insufficient evidence to support his conviction.  In ground two, Johnson argues that the jury instructions regarding prior calculation and design are deficient.  Ground three of the petition argues that admission of character evidence prejudiced the petitioner.  In ground four, Johnson argues ineffective assistance of trial counsel.

---

[1] ECF # 1.

[2] 28 U.S.C. § 2254(a).

The Magistrate Judge carefully considered each of the grounds that Johnson raises and recommends that grounds one, three and four be denied on the merits. Further, the Magistrate Judge recommends that Johnson's second ground be dismissed with prejudice as both procedurally defaulted and without merit.

## II. Background

The state court of appeals summarized the facts of the case as follows:

Surenda Ramjit shot Clifford Beller three times in the back of the head. The State of Ohio also charged Bobby Johnson with the murder. Johnson associated with a group of young people who lived in the area of Bedford, Northfield and Macedonia, Ohio, including co-defendant Ramjit. Johnson eventually became involved in a rap group that consisted of some friends and family members, including his cousin, Laquan Stowers. The members of the group occasionally funded their enterprise by selling marijuana.

Stowers was entrusted with the proceeds of the sales; however, sometime in the later part of 1998, Stowers used a portion of the group's money to have his automobile repaired. This caused a rift between the cousins, and their various friends were forced to choose sides in the dispute. Ramjit remained loyal to Johnson; Beller became more closely associated with Stowers.

On the evening of January 12, 1999, Stowers and his friends visited the home of Mary Ellen MacGregor, one of the female members of their clique. Her house was located across the street from Johnson's home. Beller, one of the few in the group who had the use of a vehicle, brought with him Stowers and two other friends, Clarence Harris and Michael Knapp. Sometime thereafter, Beller's best friend, Sean Alvis, arrived.

At some point during that evening, the group wanted to smoke marijuana, so Knapp volunteered to go across the street to ask Johnson to sell him marijuana. Upon his arrival at Johnson's residence, Knapp observed Ramjit also was there. Johnson refused to sell him any marijuana because he was aware Knapp associated with Stowers. Knapp still was engaged in his effort when Harris arrived at Johnson's door to buy a blunt. Harris was Stowers' closest ally; thus, his audacity at taking this action angered both Johnson and Ramjit. Ramjit shouted at him, ordering him off of Johnson's property.

Ramjit's belligerence sparked Harris's anger as well as his retreat. When he and Knapp returned to MacGregor's garage where the group had gathered, Harris informed Stowers of the reception he had received and told Stowers he wanted to fight Ramjit. They all discussed the matter for a time, then noticed Johnson and Ramjit emerge from the house.

As the two approached Johnson's Cadillac, parked on the street, Harris ran outside and started arguing with Ramjit and Johnson. Stowers and the other members of his clique, including Beller, followed. Harris removed his shirt in preparation for a fight with Ramjit. Ramjit, however, refused to engage with the larger and more powerful Harris. Instead, he stared at Stowers while Harris insulted him and Johnson.

Johnson and Ramjit eventually left in Johnson's Cadillac and afterwards, Stowers' group continued with their party for a time. Beller then provided a ride home to most of the young men. After Beller dropped Harris off, Beller and Sean Alvis proceeded to a restaurant where they applied for employment. Upon being informed they could start working the following day, they proceeded to Alvis's house to attend a birthday party. The two were there for approximately an hour when Johnson telephoned. Johnson spoke to Alvis only briefly before requesting Beller. Following the telephone conversation, Beller informed Alvis he had to leave to pick up some money that Ramjit owed him. Beller first drove Alvis to the apartment complex where he and Beller had been staying with friends, then drove away from there alone at approximately 11:00 p.m., turning his vehicle left onto Sagamore Road rather than using the more typical right turn, which led to Northfield Road.

At approximately 1:20 a.m. on January 13, 1999, Walton Hills Police Sergeant David Choba was on routine patrol westbound on Sagamore Road when he observed a vehicle parked in the Metroparks picnic area. The unlit vehicle was not parked in a normal parking space. In view of the hour and the extremely inclement weather, Choba decided to investigate. He engaged his cruiser's video camera before exiting.

As Choba approached the vehicle, he observed what appeared to be steam coming off the vehicle, leading him to believe it recently had arrived in the lot. He also noticed what appeared to be two bullet holes in the front windshield of the vehicle. Upon closer observation, he saw the driver of the vehicle, later identified as Clifford Beller, sitting back in his seat with his head slumped slightly to his right. Beller's head was bloody. At that point, Choba radioed for additional assistance and notified ranger headquarters of the occurrence of a possible homicide on Metroparks property.

-3-

Subsequent testimony indicated the parking area had been empty within the hour prior to the discovery of Beller's vehicle. Although investigation of the case quickly was assigned to Ranger Sergeant John Manzatt, the hazardous road conditions prevented Manzatt from arriving on the scene until approximately 2:30 a.m. While Choba waited, he took some photographs and performed some cursory investigation of the crime scene. Some tire tracks, footprints, and blood spots were found in the area of the vehicle and the parking lot. A check of the vehicle's license, moreover, provided the victim's name.

Thereafter, Manzatt took additional photographs, obtained samples of the blood spots and also located the murder weapon buried in the snow a short distance from Beller's vehicle. The subsequent autopsy of Beller's body indicated he had been shot with a .40 caliber semiautomatic handgun at least three times in the back of the head at close range.

Some of the bullets shot from the handgun had also struck the interior of Beller's vehicle; one was lodged in the steering wheel.

Forensic analysis of the body and the vehicle further indicated a significant amount of blow back of the victim's blood and brain matter had occurred during the shooting; thus, the perpetrator of the crime, who had been in the rear passenger seat, would have been marked with it. During the daytime hours of January 13, 1999, Manzatt began interviewing Beller's family and friends.

At approximately 11:30 a.m. that day, Ramjit telephoned a friend to request a ride home from Johnson's house. Johnson thereafter was observed cleaning both the exterior and the interior of his Cadillac, which he had placed inside the home's garage.

On January 14, 1999, Manzatt interviewed Johnson in connection with the murder. During that first interview, Johnson stated he and Ramjit had been at Slam Jams from 5:00 p.m. to 8:00 p.m. on the night of the shooting. After he left, Johnson said he stayed at home the rest of the night and that he left Ramjit at Slam Jams with his brother.

The next morning, Johnson's mother contacted Manzatt to arrange another interview with her son. During that interview, Johnson informed police the two left Slam Jams together and he dropped Ramjit off. Shortly thereafter, he went to a Clarkwood Gas Station in Oakwood Village and Ramjit and Beller pulled up and Ramjit told him to follow Beller to the park because he had to meet someone to pay Beller the money Ramjit owed him. He further stated when he

-4-

pulled in the picnic area, his vehicle got stuck in the snow and Beller pushed him out. As he began to drive away, he heard several shots. Ramjit then entered the passenger side of his car and told him to drive away. Johnson drove to his house and stayed there all night. He stated he did not ask Ramjit any questions and Ramjit told him if you say anything I'll kill you too.

The grand jury indicted Johnson, the driver, for aggravated murder with two firearm specifications and he retained an attorney to represent him. Johnson communicated to his attorney information about the shooting, and specifically, told him the location of a pair of blue latex gloves, the existence of which had been unknown to the police. On January 26, 1999, Johnson's counsel relayed this information to Manzatt. Counsel informed Manzatt that Johnson had told him that as he and Ramjit were driving away from the parking lot, Ramjit threw a pair of blue latex gloves out the window of the car. As a result, Manzatt located the gloves on the side of the road near the crime scene. One of the gloves tested positive for the victim's blood. The gloves were found on the east side of the parking lot and the south side of the road, which would be the passenger's side of the vehicle if it had been traveling east.[3]

Based on this evidence, the jury convicted Johnson of aggravated murder after a lengthy trial, and the trial judge sentenced him to life imprisonment.[4]

Johnson appealed to the Eighth District Judicial District Court of Appeals, raising five assignments of error.[5]  The appellate court denied Johnson's appeal,[6] and Johnson then filed

---

[3] *State v. Johnson*, No. 76999, 2001 WL 1684840, at **1-3 (Ohio Ct. of App. Dec. 20, 2001); ECF # 12, Ex. 13 at 3-9.  A presumption of correctness attaches to factual findings of the state court. *Dennis v. Mitchell*, 354 F.3d 511, 518 (6th Cir. 2003).

[4] ECF # 12, Ex. 6.

[5] *Id.,* Ex. 10.

[6] *Id.*, Ex. 13.

a memorandum in support of jurisdiction to the Supreme Court of Ohio, raising four

propositions of law.[7]  The Supreme Court of Ohio declined jurisdiction in a journal entry.[8]

Johnson has filed a petition for writ of habeas corpus in this Court raising four

grounds for relief:

> **GROUND ONE:** THE PETITIONER'S RIGHT TO DUE PROCESS
> UNDER THE FOURTEENTH AMENDMENT TO THE UNITED STATES
> CONSTITUTION WAS VIOLATED BECAUSE THE EVIDENCE WAS
> INSUFFICIENT TO PROVE BEYOND A REASONABLE DOUBT THAT
> PETITION WITHER (sic) WAS THE PRINCIPAL IN AGGRAVATED
> MURDER, BY ACTING WITH PRIOR CALCULATION AND DESIGN
>
> **GROUND TWO:** THE PETITIONER WAS DENIED DUE PROCESS OF
> LAW AND WAS DENIED A FUNDAMENTALLY FAIR TRIAL UNDER
> THE FOURTEENTH AMENDMENT TO THE UNITED STATES
> CONSTITUTION WHEREIN THE TRIAL COURT FAILED TO
> INSTRUCT THE JURY THAT IT HAD TO FIND THE ELEMENT OF
> "PRIOR CALCULATION AND DESIGN" THE PROSECUTORS MADE
> STATEMENTS TO THE JURY SUGGESTING THAT PRIOR
> CALCULATION AND DESIGN WAS NOT AN ELEMENT OF AIDING
> AND ABETTING, AND PROSECUTORS INSTRUCTED THE JURY,
> OVER PETITIONER'S OBJECTION, THAT THE PETITIONER HAD
> "CONFESSED" TO THE CRIME.
>
> **GROUND THREE:** THE PETITIONER WAS DENIED A
> FUNDAMENTALLY FAIR TRIAL AS GUARANTEED BY THE
> FOURTEENTH AMENDMENT TO THE UNITED STATES
> CONSTITUTION WHERE THE TRIAL COURT PERMITTED, OVER
> OBJECTION, AND WITHOUT A LIMITING INSTRUCTION, AN
> IMMENSE QUANTITY OF UNRELATED BAD ACTS, CRIMES,
> WRONGS, AND BAD CHARACTER EVIDENCE AGAINST THE
> PETITIONER.

---

[7] *Id.*, Ex. 15.

[8] *Id.*, Ex. 17.

**GROUND FOUR:** THE PETITIONER WAS DENIED ASSISTANCE OF COUNSEL UNDER THE SIXTH AMENDMENT AND HIS RIGHT TO ATTORNEY CLIENT PRIVILEGED COMMUNICATIONS WITH HIS COUNSEL WHERE HIS TRIAL COUNSEL REVEALED PREJUDICIAL INCRIMINATING PRIVILEGED COMMUNICATIONS TO THE STATE AND WHERE THE TRIAL COURT OVERRULED PETITIONER'S OBJECTION TO THE ADMISSION INTO EVIDENCE OF THOSE COMMUNICATIONS.

The Magistrate Judge will analyze each claim below.

## III.  Analysis

**A.**      **Second ground for relief – procedural default**

The State contends that Johnson procedurally defaulted on the second ground of his petition because he failed to contemporaneously object at trial to the jury instructions he now claims denied him a fundamentally fair trial. The state appeals court refused to consider the merits of this claim because of that failure to object.

When the state court decides a claim based on a procedural rule, the Sixth Circuit has stated in *Maupin v. Smith*[9] that the habeas court must apply a four-part analysis to determine whether the petitioner has procedurally defaulted his claims in federal court:

- Is there a procedural rule that is applicable to the petitioner's claim, and further, did the petitioner fail to follow that rule?

- Did the state court enforce the procedural rule?

- Is the state procedural rule an adequate and independent state ground to foreclose federal relief?

---

[9] *Maupin v. Smith*, 785 F.2d 135 (6th Cir. 1986).

- Once procedural default has been found, has the petitioner shown cause for his failure to follow the procedural rule and demonstrate how he was prejudiced by the constitutional error?[10]

The Court will, therefore, analyze the state appellate court's dismissal of Johnson's claims under the *Maupin* factors to determine if it should consider those claims on the merits.

## 1.    Johnson did not follow a state procedural rule.

Johnson failed to follow Ohio Criminal Rule 30(A), which allows a criminal defendant to assign error only where that defendant objects to and states the grounds for his objection before the jury deliberates its verdict.[11]   Johnson did not object to the jury instructions at trial and subsequently included an assignment of error regarding those jury instructions.[12]  Johnson, therefore, did not comply with the Ohio procedural rule requiring a contemporaneous objection.

## 2.    The state court enforced the procedural rule.

The state court of appeals enforced Criminal Rule 30(A).  In its opinion, the court declined to review Johnson's claim that the jury was not properly instructed.[13]  The state court reasoned that a failure to object constituted waiver of that claim on appeal.[14]

---

[10] *Id.* at 138.

[11] Ohio R. Crim P. 30(A).

[12] ECF # 12, Ex. 23.

[13] *Id.*, Ex. 13 at 23.

[14] *Id.,* Ex. 13 at 23.

-8-

**3.    *The procedural rule was an adequate and independent basis for precluding review of the claim.***

A state court decision is adequate for purposes of *Maupin* analysis, according to the Sixth Circuit in *Abela v. Martin*,[15] if the rule upon which it relies is "firmly established and regularly followed at the time it is applied."[16]  *Abela* also held that a rule is an independent basis for a decision if "the state court actually relied on the rule to bar the claim at issue."[17]

Johnson makes no serious contention that the contemporaneous objection rule as applied here was not adequate or independent under *Abela*'s understanding of those terms. The appellate court relied on that rule in refusing to consider Johnson's assignment of error directed at the jury instruction.[18]  Furthermore, the Sixth Circuit has established that Ohio's contemporaneous objection rule as applied to jury instructions is adequate.[19]

**4.    *Johnson does not demonstrate cause and prejudice to excuse procedural default.***

Although Johnson recognizes that a petitioner must ordinarily demonstrate cause and prejudice to excuse procedural default,[20] he argues that a "fundamental miscarriage of justice" took place at trial when the jury was not given the proper instructions, and,

---

[15] *Abela v. Martin*, 380 F.3d 915 (6th Cir. 2004).

[16] *Id.* at 921.

[17] *Id.*

[18] ECF # 12, Ex. 13 at 23.

[19] *Gulertekin v. Tinnelman-Cooper*, 340 F.3d 415, 423-24 (6th Cir. 2003).

[20] ECF # 17 at 24-25.

therefore, this miscarriage of justice should excuse procedural default and allow this Court to review ground two on its merits.[21]

Accordingly, and absent any assertion of innocence, the "fundamental miscarriage of justice" exception discussed by the Supreme Court in *Murray v. Carrier*[22] is the sole method by which Johnson here seeks to excuse his procedural default.

**5.     *Johnson cannot establish that the jury instruction at issue created a fundamental miscarriage of justice.***

Johnson argues that failing to consider his jury instruction claim would create a fundamental miscarriage of justice.[23]  Essentially, he maintains that he was convicted of a crime that required a specific finding of intent, but the jury was not properly instructed of that fact.[24]

The state initially relies on its contention that Johnson has procedurally defaulted on this ground.[25]  However, it further responds by contending that Johnson has not made a cognizable federal claim, instead relying on claimed errors of state law which were not pled as federal claims in state court.[26]  Finally, the state maintains that the jury instructions were

---

[21] *Id.* at 25.

[22] *Murray v. Carrier*, 477 U.S. 478, 495-96 (1986).

[23] ECF # 17 at 25.

[24] *Id.*

[25] ECF # 20 at 8.

[26] *Id.*

correct and that they required the jury to find Johnson guilty of each element of the principal offense to be found guilty as an aider and abettor, including finding intent.[27]

Because Johnson's asserted claim of a fundamental miscarriage of justice may arguably place any defect in the instruction beyond the purview of harmless error analysis,[28] this Court should proceed to review the actual instruction at issue. There cannot be any fundamental miscarriage of justice, nor can there be a decision by the state court of appeals that is contrary to clearly established federal law, if the trial court properly instructed the jury.  An analysis of the jury instruction at issue demonstrates that no fundamental miscarriage of justice occurred, and, therefore, that Johnson's second ground for relief has no merit.

Ohio Revised Code § 2923.03(F) provides, in relevant part, that "[a] charge of complicity may be stated in terms of this section, or in terms of the principal offense."[29] Ohio Revised Code § 2903.01 defines the principal offense, aggravated murder, in pertinent part:  "No person shall purposely, and with prior calculation and design, cause the death of another[.]"[30]

---

[27] *Id.*

[28] *Neder v. United States*, 527 U.S. 1, 19 (1999).

[29] Ohio Rev. Code § 2923.03(F).

[30] Ohio Rev. Code § 2903.01.

The trial court judge complied with Ohio Revised Code § 2923.03(F) and stated the complicity charge in terms of the principal offense.[31]  Contrary to Johnson's strident assertion that the Ohio trial judge "**did not even instruct the jurors that Mr. Johnson had to intend to cause the death of another person**,"[32] the trial record plainly shows that the judge instructed the jury:

> "Before you can find the defendant guilty you must find beyond a reasonable doubt that on or about the 13th day of January, 1999 in Cuyahoga County, the defendant purposely and with prior calculation and design caused the death of another, to wit: Clifford Beller, Jr.  Purpose is with prior calculation and design, cause the death of another is an essential element of the crime of aggravated murder. *** **Purpose and intent mean the same thing.**"[33]

The actual trial instructions properly and explicitly contained the charge that the jury must find Johnson acted with intent to cause the death of another and that such a finding is an essential element of the crime.  No fundamental miscarriage of justice occurred to excuse Johnson's procedural default, and the second ground for relief fails on the merits.

**B.    Third ground for relief – due process challenge to state evidentiary rulings**

Johnson argues in his third ground for the writ that the state trial court denied him due process and a fair trial when it admitted evidence of prior bad acts.[34]

---

[31] Tr. at 1818-21.

[32] ECF # 17 at 27 (emphasis in the original).

[33] ECF # 13, Ex. 18, Vol. 5. at 1818-19 (emphasis added).

[34] ECF # 1 at 3.

In habeas proceedings, state law questions such as the admissibility of evidence at trial are generally not proper grounds for relief.[35] "Errors in the application of state law, especially rulings regarding the admission or exclusion of evidence, are usually not to be questioned in a federal habeas corpus proceeding."[36]  Specifically, weighing the probative or prejudicial effect of evidence has long been, for the most part, reserved to the discretion of the state trial judge.[37]  Generally, evidentiary rulings by the trial court cannot be considered a violation of federal due process rights unless they "offend[] some principle of justice so rooted in the traditions and conscience of our people as to be ranked as fundamental."[38]

On review, the state appeals court carefully examined the claims of improperly admitted evidence and found them unsupported in Ohio law.[39]

For purposes of this petition, the judgment of the trial judge as affirmed by the state appeals court will be disturbed only under the test endorsed in *Brecht v Abrahamson.*[40] *Brecht* holds that any claimed error of state law during trial can provide a basis for relief on

---

[35] *Pulley v. Harris*, 465 U.S. 37, 41 (1984).

[36] *Walters v. Kassulke*, 916 F.2d 329, 335 (6th Cir. 1990) (quoting *Cooper v. Sowders*, 837 F.2d 284, 286 (6th Cir. 1988)).

[37] *Oliphant v. Koehler,* 594 F.2d 547, 555 (6th Cir. 1979).

[38] *Seymour v. Walker*, 224 F.3d 542, 552 (6th Cir. 2000) (quoting *Montana v. Egelhoff*, 518 U.S. 37, 43 (1996)).

[39] ECF # 12, Ex. 13 at 21.

[40] *Brecht v. Abrahamson,* 507 U.S. 619 (1993).

collateral review only if it "had a substantial and injurious effect or influence in determining the jury's verdict."[41]

Here, Johnson asserts that the state was permitted to present over defense objections evidence that Johnson owned an automatic weapon, was dealing drugs, aspired to gang affiliations, went about armed, and was known to be "a bad ass."[42]

The state appeals court observed that "[i]n its case in chief, the state offered the testimony of twenty-seven witnesses, which included Johnson's friends and acquaintances, police, forensic examiners, and medical examiners, among others."[43] The "defense did not introduce any evidence."[44]

In attempting to discern what evidence may have had a particular effect on the jury, this Court has carefully reviewed the closing arguments at trial. The prosecutor's summary to the jury, while noting the evidence here complained of by Johnson, placed particular emphasis on discrepancies between Johnson's version of events and the undisputed physical evidence, as well as logical inferences from that evidence.  The prosecutor argued:

- Johnson was seen cleaning only the inside of his car the day after the murder;[45]

---

[41] *Id.* at 637.

[42] ECF # 17 at 39.

[43] ECF # 12, Ex. 13 at 11.

[44] *Id.* at 13.

[45] ECF # 13 at 1698.

- Johnson invited Ramjit, who Johnson maintained was the killer, to spend the night after the murder in his house and Ramjit left there wearing only a tank top on a cold winter day.  This is inconsistent with Johnson's testimony that he was afraid of Ramjit but consistent with the coroner's testimony that the murder would have produced copious amounts of blood that would have required Ramjit to dispose of his clothing;[46]

- Johnson was inconsistent in telling how Ramjit got to the murder scene. He first tells police that Ramjit came with him, but later, in a handwritten statement, indicated that Ramjit came with the victim;[47]

- Johnson's story that Ramjit must have put on the latex gloves to kill the victim makes sense only if Ramjit put on the gloves while in Johnson's car;[48]

- Likewise, Johnson must have known they were transporting the gun to the murder scene, although he said he hadn't seen a gun that night, since he described it to police;[49]

- The coroner's evidence is that the victim was shot from the left side while Johnson testified that Ramjit was on the victim's right;[50]

- The trail of blood goes toward the tire tracks, not toward the road where Johnson's story would have him;[51]

---

[46] *Id*. at 1699.

[47] *Id.* at 1701. ("If he's with Clifford you can't drop him off [to meet Clifford]. Right?")

[48] *Id.* at 1702. ("[T]hese rubber gloves aren't that easy to put on. Ramjit didn't just automatically slide these on and run over and start shooting Clifford.")

[49] *Id.* at 1704.

[50] *Id.* at 1705-06.

[51] *Id.* at 1706.

- The physical evidence shows the body was moved after the killing, also inconsistent with Johnson's story but consistent with propping a dead body up for more shots to be fired.[52]

Finally, the prosecutor finished by leaving the jury with questions about the gloves, a critical piece of hard evidence.  Johnson had testified that Ramjit had tossed them from the car.  The prosecutor suggested that it was incredible:

> [T]hose gloves miraculously lay along the road, snowplow after snowplow, salt job after salt job going by, and after they're recovered on the 26th, after that telephone call, they still get DNA off them.  We're being manipulated, me, you – we're being manipulated here just the way they manipulated Clifford to go down there and get killed.
>
> Where were those gloves?  Were those gloves with the rest of the bloody clothing? We know Ramjit didn't have that stuff with him when he left the defendant's house the next morning ***.[53]

These arguments made to the jury, plus the three-page summary of evidence adduced at trial recited by the state appeals court,[54] as well as the record contained in six volumes of trial transcripts,[55] do not support the view that admission of the particular evidence complained of here, considered in the context of the trial as a whole, had a "substantial and injurious effect or influence on the jury's verdict."[56]

Accordingly, ground three of Johnson's petition should be denied.

---

[52] *Id.* at 1709.

[53] *Id.* at 1808.

[54] *Id.* at 11-13.

[55] ECF # 13, Vols. 1-6.

[56] *Calderon v. Coleman,* 525 U.S. 141, 147 (1998).

**C.    First and fourth grounds for relief – insufficient evidence and ineffective assistance of counsel**

*1.    Standard of review – The Antiterrorism and Effective Death Penalty Act*

Where a petitioner presents a ground for relief that must be decided on its merits, the Antiterrorism and Effective Death Penalty Act of 1996[57] ("AEDPA") designates the appropriate standard of review.  The AEDPA increased the deference that federal courts must give to the decisions of state courts in deciding petitions for habeas corpus relief.  The AEDPA amended the standard of review in 28 U.S.C. § 2254(d) to prohibit habeas corpus relief unless the decision of the state court either diverges from federal law as determined by the Supreme Court of the United States **or** rests on an unreasonable determination of the facts from the evidence of record:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim –
>
> (1)    resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2)    resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.[58]

Where the state court correctly identified the controlling Supreme Court authority but had to apply it to facts materially different from those faced by the Court in establishing the

---

[57] Pub. L. No. 104-132, 110 Stat. 1214 (1996).

[58] 28 U.S.C. § 2254(d).

-17-

controlling authority, the "unreasonable application" clause of § 2254(d)(1) comes into play.[59] Under the "unreasonable application" clause, the federal habeas court must grant the writ if the state court adopted the correct governing legal principle from the decisions of the Supreme Court but unreasonably applied that principle to the facts of the petitioner's case.[60] Whether the state court unreasonably applied the principle turns on whether the state court's application of clearly established federal law was objectively unreasonable.[61] The Sixth Circuit has held that where the state court reaches the merits of a constitutional claim without applying clearly established federal law, the district court should review the decision to determine whether it was "contrary to" clearly established federal law.[62]

## 2.    *Insufficiency of the evidence*

Johnson argues in ground one that the state court of appeals unreasonably applied *Jackson v. Virginia*.[63] Hall responds by arguing that the court identified the clearly established law of *Jackson* and, further, argues that *Jackson* was reasonably applied.

The state court of appeals applied *Jackson* in deciding Johnson's claim that his conviction was not supported by sufficient evidence.[64] Although the state court did not cite

---

[59] *Williams v. Taylor*, 529 U.S. 362, 407, 408 (2000).

[60] *Id.* at 413.

[61] *Id.* at 409.

[62] *Maples v. Stegall*, 340 F.3d 433, 437 (6th Cir. 2003).

[63] ECF # 17 at 12, citing *Jackson v. Virginia*, 443 U.S. 307, 324 (1979).

[64] ECF # 12, Ex. 13 at 9-14.

*Jackson* directly, the citation to *State v. Jenks* is quoted directly from the syllabus, which specifically incorporates the *Jackson* standard.[65]  Therefore, this Court should determine whether the state court of appeals' application of *Jackson* was unreasonable.

The Supreme Court, in *Jackson v. Virginia*, reviewed whether, on habeas corpus review, sufficient evidence existed to support a conviction beyond a reasonable doubt on every element of defendant Jackson's offense.  The court crystallized that standard by instructing courts to review the sufficiency of the evidence by determining "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."[66]

The state court of appeals held that "after viewing the evidence in a light most favorable to the prosecution, we have concluded any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt."[67]  As previously noted, the appeals court noted that the state had produced twenty-seven witnesses.[68]  Moreover, as recounted earlier, the state argued that Johnson's statements were inconsistent among themselves, with the physical evidence, and with other witnesses.

---

[65] *Id.*, Ex. 13 at 10, citing *State v. Jenks*, 61 Ohio St. 3d 259, 574 N.E.2d 492, 494 (1991) (paragraph two of the syllabus).

[66] *Jackson*, 443 U.S. at 319 (emphasis in the original).

[67] ECF # 12, Ex. 13 at 14.

[68] *Id.* at 11.

-19-

The court of appeals analyzed this specific evidence in light of the elements of aggravated murder and stated that the evidence proffered at trial was sufficient to allow a rational jury to find Johnson guilty of the elements of the crime, and denied Johnson relief.[69]

The state court of appeals' application of *Jackson* was reasonable.  On this record, taken as a whole and viewed most favorably to the state, a rational trier of fact could have found Johnson guilty of aiding and abetting aggravated murder.  Johnson's first ground for relief should be denied.

### 3.    *Ineffective assistance of counsel*

In his fourth and final ground for relief, Johnson argues that the state court of appeals unreasonably applied the clearly established federal law of *Strickland v. Washington*.[70] Specifically, Johnson argues that the state court of appeals erred when it found that the jury would have convicted Johnson despite defense counsel's revealing the location of a pair of latex gloves at the crime scene to the police.  Hall argues that the state court of appeals decision was reasonable.

The state court of appeals applied *Strickland* in deciding Johnson's ineffective assistance of trial counsel claim in state court.[71]  Therefore, this Court should determine whether the state court of appeals' application of *Strickland* was unreasonable.

---

[69] *Id.* at 14.

[70] ECF # 17 at 34-38.

[71] ECF # 12, Ex. 13 at 15.

The clearly established federal law governing ineffective assistance of counsel claims was set forth by the Supreme Court in *Strickland v. Washington*.[72]  There, the Court established a two-part analysis for determining the constitutional effectiveness of counsel.[73] First, counsel's actions must be "outside the wide range of professionally competent assistance."[74]  Under this first part of the analysis, the defendant or petitioner must overcome a presumption that the challenged decision was part of sound trial strategy.[75]  Second, where counsel is professionally unreasonable, the deficient performance by counsel must prejudice the defendant – that is, there must be a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."[76]

*Strickland* advised reviewing courts to first consider the prejudice component of the analysis and to examine performance only if sufficient prejudice exists to support the claim.[77]

The state court of appeals held that trial counsel's decision to reveal the location of evidence at the crime scene to the police did not amount to ineffective assistance of counsel.[78]  The court of appeals reasoned "the evidence presented against Johnson mitigates

---

[72] *Strickland v. Washington*, 466 U.S. 668 (1984).

[73] *Id*. at 668.

[74] *Id*. at 690.

[75] *Id*. at 689, 690.

[76] *Id*. at 694.

[77] *Id*. at 697.

[78] ECF # 12, Ex. 13 at 17.

the impact of his defense attorney's communication to [Officer] Manzatt.  Therefore, we conclude that Johnson failed to prove that but for counsel's error the results of the trial would have been different."[79]

The state court of appeals cited the two-pronged test of *Strickland* and applied the correct clearly established federal law to Johnson's ineffective assistance claim.  In doing so, the appellate court correctly found that the purported error asserted by Johnson was not prejudicial in that it was not "so serious as to deprive the defendant of a fair trial, a trial whose result is unreliable."[80]

As noted previously, the state extensively argued the inconsistencies between Johnson's statements and the physical evidence.  Even without the gloves, credible evidence existed that Johnson's phone call set up the victim, that he drove out with the other killer, that he knew the gun despite claiming not to have seen a gun that night, that he offered inconsistent stories as to his physical location at the time of the shooting, that the body was moved for additional shots to be fired, and that Johnson had hosted the other defendant at his home immediately after the killings, when forensic evidence established he would have been covered in blood, despite claiming to be afraid of him.

Johnson's fourth and final ground for relief should be denied.

---

[79] *Id*.

[80] *Strickland,* 466 U.S. at 687.

## IV. Conclusion and Recommendation

The Magistrate Judge recommends dismissing Johnson's second ground for relief as procedurally defaulted or, alternatively, on the merits.  Further, the Magistrate Judge recommends dismissing the third ground for relief as failing to establish that any error in permitting the introduction of evidence at trial rose to the level of a justiciable federal due process claim.  Finally, the Magistrate Judge recommends that Johnson's first and fourth grounds for relief be denied because the state court of appeals reasonably applied clearly established federal law in deciding those claims against him.


Dated:   February 9, 2006                         s/ William H. Baughman, Jr.                      
                                                            United States Magistrate Judge


### Objections

Any objections to this Report and Recommendation must be filed with the Clerk of Courts within ten (10) days of receipt of this notice.  Failure to file objections within the specified time waives the right to appeal the District Court's order.[81]

---

[81]*See United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).  *See also Thomas v. Arn*, 474 U.S. 140 (1985), *reh'g denied*, 474 U.S. 1111 (1986).