**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **Bobby A. Johnson,** | ) | **CASE NO. 1:03 CV 1613** |
| | ) | |
| **Petitioner,** | ) | **JUDGE PATRICIA A. GAUGHAN** |
| | ) | |
| **vs.** | ) | |
| | ) | |
| **Richard Hall, Warden,** | ) | **Memorandum of Opinion and Order** |
| | ) | |
| **Respondent.** | ) | |

This matter is before the Court upon the Report and Recommendation of Magistrate

Judge Baughman (Doc. 23) which recommends denial of the Petition for Writ of Habeas Corpus

now pending before the Court.  For the following reasons, the Report and Recommendation is

ACCEPTED.

**Introduction**

Petitioner, Bobby A. Johnson, commenced this action with the filing of a Petition for

Writ of Habeas Corpus pursuant to 28 U.S.C. § 2254.  Petitioner is incarcerated after a jury trial

in the Cuyahoga County Court of Common Pleas.  This matter has been fully briefed and the

Magistrate Judge issued his Report and Recommendation recommending that the Petition for

1

Writ of Habeas Corpus be denied.  Petitioner has filed Objections to the Report and Recommendation.

**Standard of Review**

Rule 8(b) of the Rules Governing Section 2254 Cases in the United States District Courts provides, "The judge must determine *de novo* any proposed finding or recommendation to which objection is made.  The judge may accept, reject, or modify any proposed finding or recommendation."

**Discussion**

A jury found petitioner guilty of aggravated murder.  Petitioner asserts four grounds in support of his Petition.  For the following reasons, the Court agrees with the Magistrate Judge that none warrants issuance of the Writ.

Ground One asserts that petitioner was denied due process because the evidence was insufficient to prove beyond a reasonable doubt that petitioner was either the principal, or that he aided and abetted the principal in aggravated murder, by acting with prior calculation and design.

The state Court of Appeals found the following facts:

Surenda Ramjit shot Clifford Beller three times in the back of the head. The State of Ohio also charged Bobby Johnson with the murder. Johnson associated with a group of young people who lived in the area of Bedford, Northfield and Macedonia, Ohio, including co-defendant Ramjit. Johnson eventually became involved in a rap group that consisted of some friends and family members, including his cousin, Laquan Stowers. The members of the group occasionally funded their enterprise by selling marijuana. Stowers was entrusted with the proceeds of the sales; however, sometime in the later part of 1998, Stowers used a portion of the group's money to have his automobile repaired. This caused a rift between the cousins, and their various friends were forced to choose sides in the dispute. Ramjit remained loyal to Johnson; Beller became more closely associated with Stowers.

On the evening of January 12, 1999, Stowers and his friends visited the home of Mary Ellen MacGregor, one of the female members of their clique. Her house was located

2

across the street from Johnson's home. Beller, one of the few in the group who had the use of a vehicle, brought with him Stowers and two other friends, Clarence Harris and Michael Knapp. Sometime thereafter, Beller's best friend, Sean Alvis, arrived.

At some point during that evening, the group wanted to smoke marijuana, so Knapp volunteered to go across the street to ask Johnson to sell him marijuana. Upon his arrival at Johnson's residence, Knapp observed Ramjit also was there. Johnson refused to sell him any marijuana because he was aware Knapp associated with Stowers. Knapp still was engaged in his effort when Harris arrived at Johnson's door to buy a 'blunt.' Harris was Stowers' closest ally; thus, his audacity at taking this action angered both Johnson and Ramjit. Ramjit shouted at him, ordering him off of Johnson's property.

Ramjit's belligerence sparked Harris's anger as well as his retreat. When he and Knapp returned to MacGregor's garage where the group had gathered, Harris informed Stowers of the reception he had received and told Stowers he wanted to fight Ramjit. They all discussed the matter for a time, then noticed Johnson and Ramjit emerge from the house.

As the two approached Johnson's Cadillac, parked on the street, Harris 'ran outside and started arguing' with Ramjit and Johnson. Stowers and the other members of his clique, including Beller, followed. Harris removed his shirt in preparation for a fight with Ramjit. Ramjit, however, refused to engage with the larger and more powerful Harris. Instead, he stared at Stowers while Harris insulted him and Johnson.

Johnson and Ramjit eventually left in Johnson's Cadillac and afterwards, Stowers' group continued with their party for a time. Beller then provided a ride home to most of the young men. After Beller dropped Harris off, Beller and Sean Alvis proceeded to a restaurant where they applied for employment. Upon being informed they could start working the following day, they proceeded to Alvis's house to attend a birthday party. The two were there for approximately an hour when Johnson telephoned. Johnson spoke to Alvis only briefly before requesting Beller. Following the telephone conversation, Beller informed Alvis he had to leave to pick up some money that Ramjit owed him. Beller first drove Alvis to the apartment complex where he and Beller had been staying with friends, then drove away from there alone at approximately 11:00 p.m., turning his vehicle left onto Sagamore Road rather than using the more typical right turn, which led to Northfield Road.

At approximately 1:20 a.m. on January 13, 1999, Walton Hills Police Sergeant David Choba was on routine patrol westbound on Sagamore Road when he observed a vehicle parked in the Metroparks picnic area. The unlit vehicle was not parked in a normal parking space. In view of the hour and the extremely inclement weather, Choba decided to investigate. He engaged his cruiser's video camera before exiting.

As Choba approached the vehicle, he observed what appeared to be steam coming off the vehicle, leading him to believe it recently had arrived in the lot. He also noticed what

3

appeared to be two bullet holes in the front windshield of the vehicle. Upon closer observation, he saw the driver of the vehicle, later identified as Clifford Beller, sitting back in his seat with his head slumped slightly to his right. Beller's head was bloody. At that point, Choba radioed for additional assistance and notified ranger headquarters of the occurrence of a possible homicide on Metroparks property.

Subsequent testimony indicated the parking area had been empty within the hour prior to the discovery of Beller's vehicle. Although investigation of the case quickly was assigned to Ranger Sergeant John Manzatt, the hazardous road conditions prevented Manzatt from arriving on the scene until approximately 2:30 a.m. While Choba waited, he took some photographs and performed some cursory investigation of the crime scene. Some tire tracks, footprints, and blood spots were found in the area of the vehicle and the parking lot. A check of the vehicle's license, moreover, provided the victim's name.

Thereafter, Manzatt took additional photographs, obtained samples of the blood spots and also located the murder weapon buried in the snow a short distance from Beller's vehicle. The subsequent autopsy of Beller's body indicated he had been shot with a .40 caliber semiautomatic handgun at least three times in the back of the head at close range.

 Some of the bullets shot from the handgun had also struck the interior of Beller's vehicle; one was lodged in the steering wheel.

 Forensic analysis of the body and the vehicle further indicated a significant amount of 'blow back' of the victim's blood and brain matter had occurred during the shooting; thus, the perpetrator of the crime, who had been in the rear passenger seat, would have been marked with it. During the daytime hours of January 13, 1999, Manzatt began interviewing Beller's family and friends.

At approximately 11:30 a.m. that day, Ramjit telephoned a friend to request a ride home from Johnson's house. Johnson thereafter was observed cleaning both the exterior and the interior of his Cadillac, which he had placed inside the home's garage.

On January 14, 1999, Manzatt interviewed Johnson in connection with the murder. During that first interview, Johnson stated he and Ramjit had been at Slam Jams from 5:00 p.m. to 8:00 p.m. on the night of the shooting. After he left, Johnson said he stayed at home the rest of the night and that he left Ramjit at Slam Jams with his brother.

The next morning, Johnson's mother contacted Manzatt to arrange another interview with her son. During that interview, Johnson informed police the two left Slam Jams together and he dropped Ramjit off. Shortly thereafter, he went to a Clarkwood Gas Station in Oakwood Village and Ramjit and Beller pulled up and Ramjit told him to follow Beller to the park because he had to meet someone to pay Beller the money Ramjit owed him. He further stated when he pulled in the picnic area, his vehicle got stuck in the snow and Beller pushed him out. As he began to drive away, he heard several shots. Ramjit then

4

entered the passenger side of his car and told him to drive away. Johnson drove to his house and stayed there all night. He stated he did not ask Ramjit any questions and Ramjit told him 'if you say anything I'll kill you too.'

The grand jury indicted Johnson, the driver, for aggravated murder with two firearm specifications and he retained an attorney to represent him. Johnson communicated to his attorney information about the shooting, and specifically, told him the location of a pair of blue latex gloves, the existence of which had been unknown to the police. On January 26, 1999, Johnson's counsel relayed this information to Manzatt. Counsel informed Manzatt that Johnson had told him that as he and Ramjit were driving away from the parking lot, Ramjit threw a pair of blue latex gloves out the window of the car. As a result, Manzatt located the gloves on the side of the road near the crime scene. One of the gloves tested positive for the victim's blood. The gloves were found on the east side of the parking lot and the south side of the road, which would be the passenger's side of the vehicle if it had been traveling east.

*State v. Johnson,* 2001 WL 1684840  (Ohio App. 8th  Dist. December 20, 2001).

The state appellate court concluded, after reviewing the record, that this is not a case where "the jury clearly lost its way."  Rather, the court noted that the state offered the testimony of 27 witnesses[1] and it analyzed the testimony of numerous witnesses, in light of the elements of aggravated murder.  It viewed the evidence in a light most favorable to the prosecution, and determined that any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt.

The Magistrate Judge concluded that the court's finding did not involve an unreasonable application of clearly established federal law which states that, in reviewing sufficiency of the evidence, courts determine whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. This Court agrees.

The trial testimony shows that the jury heard the following evidence.  Petitioner made the

---

[1]      The defense did not introduce any evidence.

5

telephone call which precipitated the encounter with Ramjit and petitioner.   Petitioner gave

inconsistent statements to the police as to whether he followed Ramjit and the victim to the

crime scene or whether Ramjit was transported in petitioner's car as they followed the victim to

the scene.  The physical evidence at the scene undermined petitioner's version of the events,

which included his statement that as he was driving away from the victim and Ramjit in the park,

he heard gunshots and then saw Ramjit run to petitioner's car and get in.  Petitioner knew the

identity of the gun although he told police he had not seen it the night of the murder.  Petitioner

asked Ramjit to stay at petitioner's home the night of the killings because petitioner was afraid

he would be stopped for expired tags, despite petitioner's testimony that he was afraid of Ramjit.

Petitioner told police Ramjit did not have any blood on him in contrast to testimony that the

perpetrator would have been marked with a significant amount of blood.  Ramjit left petitioner's

house the following day wearing only a tank top despite the January weather, raising suspicion

that Ramjit may have been forced to rid himself of his bloody clothes.   Petitioner was seen

cleaning the interior of his car in his garage (parked there rather than in its usual parking place in

the driveway). Based on all the testimony, any rational jury could have found petitioner guilty.

Ground One fails on the merits.

Ground Two alleges that petitioner was denied due process and a fair trial when the trial

court failed to instruct the jury that it had to find the element of prior calculation and design, the

prosecutors made statements to the jury suggesting that prior calculation and design was not an

element of aiding and abetting and prosecutors instructed the jury, over petitioner's objection,

that petitioner confessed to the crime.

The Magistrate Judge concluded that petitioner procedurally defaulted this claim because

petitioner failed to contemporaneously object at trial to the jury instructions and the appellate

court refused to consider the merits of the claim because of the failure to object.  Moreover,

because the trial court did not improperly instruct the jury, no fundamental miscarriage of justice

occurred to excuse the default.

This Court agrees that this claim was defaulted on this basis.  Moreover, the trial court

instructed the jury:

> Before you can find the defendant guilty you must find beyond a reasonable doubt that on
> or about the 13th day of January 1999, in Cuyahoga County, the defendant purposely and
> with prior calculation and design caused the death of another, to wit: Clifford Beller, Jr.
>
> Purpose is with prior calculation and design, cause the death of another is an essential
> element of the crime of aggravated murder.
>
> A person acts purposely when it is his specific intention to cause a certain result.  It must
> be established in this case that at the time in question there was present in the mind of the
> defendant a specific intention to purposely and with prior calculation and design, cause
> the death of another.
>
> ... Purpose and intent mean the same thing..

(Tr. 1818-1819)

Because the instructions at trial charged the jury that they must find that petitioner acted with

intent to cause the death of another and that such a finding is an essential element of the crime,

there was no fundamental miscarriage of justice.

Ground Two fails.

Ground Three alleges that petitioner was denied a fair trial when the trial court permitted,

over his objection and without a limiting instruction, an immense quantity of unrelated bad acts,

crimes, wrongs and bad character evidence, to wit: petitioner owned an automatic weapon, was

doing drugs, aspired to gang affiliations, went about armed and was known to be a "bad ass."

The Magistrate Judge rejected this claim which was examined by the state appellate court.  This Court agrees that given the context of the trial as a whole, the claimed error of state law regarding the admissibility of evidence did not have a substantial and injurious effect or influence in determining the jury's verdict and, therefore, habeas relief on this basis is not warranted.

Ground Three fails.

Ground Four asserts that petitioner was denied effective assistance of counsel and his right to attorney-client privileged communications with his counsel where his trial counsel revealed incriminating privileged communications to the state and where the trial court overruled petitioner's objection to the admission of the communications.

The state appellate court rejected petitioner's assertion that his counsel was ineffective because he revealed a privileged communication regarding the location of the blue latex gloves to Sergeant Manzatt.  The Magistrate Judge concluded that the state court did not unreasonably apply *Strickland v. Washington,* 466 U.S. 668 (1984). This Court agrees.

The state court concluded that the evidence presented against petitioner mitigated against the impact of his attorney's communication to the sergeant and, therefore, there was no demonstration that but for counsel's errors, the results of the trial would have been different. This Court finds no unreasonable application of *Strickland.*   The jury heard testimony that petitioner's phone call set up the victim; petitioner drove to the scene with the killer; petitioner knew the identity of the gun although he told police he had not seen it the night of the murder; petitioner told inconsistent stories as to his whereabouts at the time of the shooting; evidence showed the body was moved for additional shots to be fired; the evidence at the scene

8

contradicted petitioner's account; Ramjit stayed at petitioner's home the night of the killing,

leaving only in a tank top; and petitioner was seen cleaning the interior of his car in his garage

(parked there rather than in its usual parking place in the driveway).

Ground Four fails.

For the foregoing reasons, petitioner has not demonstrated that the Petition for Writ of

Habeas Corpus should be granted.

**Conclusion**

For the reasons set forth herein and for the reasons set forth in the Magistrate Judge's

Report and Recommendation, the Petition for Writ of Habeas Corpus is denied.  Further, this

Court hereby fully incorporates the Report and Recommendation by reference herein.

This Court now considers whether to grant a certificate of appealability (COA) pursuant

to 28 U.S.C. § 2253 which states in relevant part:

> \*\*\*
> (c)(1) Unless a circuit justice or judge issues a certificate of appealability, an appeal may
> not be taken to the court of appeals from –
>
> > (A) the final order in a habeas corpus proceeding in which the
> > detention complained of arises out of process issued by a State
> > court . . .
>
> (2) A certificate of appealability may issue under paragraph (1) only if the
> applicant has made a substantial showing of the denial of a constitutional right.

In *Slack v. McDaniel*, 529 U.S. 473 (2000), the United States Supreme Court determined

that

> "[t]o obtain a COA under § 2253(c), a habeas prisoner must make a substantial
> showing of the denial of a constitutional right, a demonstration that, under
> *Barefoot*, includes showing that reasonable jurists could debate whether (or, for
> that matter, agree that) the petition should have been resolved in a different
> manner or that the issues presented were "'adequate to deserve encouragement to

9

proceed further.'"

*Id.* at 483-4 (quoting *Barefoot v. Estelle*, 463 U.S. 880, 893 n.4 (1983) ).

If the claim is not procedurally defaulted, then a habeas court need only determine whether reasonable jurists would find the district court's decision "debatable or wrong."  *Id.* at 484.  In instances where a claim is  procedurally defaulted, a COA should only issue if "jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right *and* that jurists of reason would find it debatable whether the district court was correct in its procedural ruling."  *Id.* (emphasis supplied).

For the reasons stated above and in the Report and Recommendation, this Court finds no basis upon which to issue a certificate of appealablity.

IT IS SO ORDERED.

/s/ Patricia A. Gaughan
PATRICIA A. GAUGHAN
United States District Judge

Dated: 9/21/06